UNITED STATES of America, Appellee,

v.

Daniel M. PILLA, Appellant.

No. 76–1616.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 8, 1976.

Decided Jan. 5, 1977.

Rehearing and Rehearing En Banc
Denied March 15, 1977.

Neal J. Shapiro, Minneapolis, Minn. and Daniel M. Pilla, St. Paul, Minn., on briefs for appellant.

Robert G. Renner, U.S. Atty., Francis X. Hermann, Asst. U.S. Atty. and Richard Fellows, Intern, Minneapolis, Minn., on briefs for appellee.

Before GIBSON, Chief Judge, and HEANEY and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

On November 13, 1974 the federal grand jury for the District of Minnesota returned a one-count indictment against the defendant-appellant, Daniel M. Pilla, charging in substance that on or about August 10, 1974 the defendant unlawfully attempted and endeavored to rescue from premises described as Room B101, 230 E. 5th Street, St. Paul, Minnesota, certain property that had been seized by the Internal Revenue Service (IRS) under the provisions of the Internal Revenue Code of the United States, 26 U.S.C. § 7212(b).[1]

---

1. The statute reads as follows:

(b) *Forcible rescue of seized property.*— Any person who forcibly rescues or causes to be rescued any property after it shall have been seized under this title, or shall attempt or endeavor so to do, shall, excepting in cases otherwise provided for, for every such offense, be fined not more than $500, or not more than double the value of the property so rescued, whichever is the greater, or be imprisoned not more than 2 years.

The case was assigned originally to Chief United States District Judge Edward J. Devitt and was set down for arraignment. On November 22, 1974 the defendant, acting pro se, filed an affidavit of prejudice against Judge Devitt, which affidavit also involved District Judges Larson and Lord. The originally scheduled arraignment was not held.

In January, 1975 District Judge Donald D. Alsop went on the bench in Minnesota, and Judge Devitt assigned the case to him. The defendant promptly moved to disqualify Judge Alsop and requested that he be represented by Jerome Daly, a disbarred Minnesota attorney.[2] On June 20, 1975 the case came on for hearing before Judge Alsop on the motion to disqualify and for leave to the defendant to be represented by Daly and also for arraignment. Judge Alsop refused to disqualify himself and also refused to permit the defendant to be represented by Daly or other lay counsel. The defendant thereupon refused to plead, and a plea of not guilty was entered for him.[3]

In July, 1975 a number of pretrial motions were filed on behalf of the defendant by Mr. Neal J. Shapiro of the Minneapolis Bar. The record available to us does not clearly reflect the circumstances in which Mr. Shapiro came into the case. We think it unlikely that the defendant employed him, and he may well have been appointed by Judge Alsop. In any event, the defendant did not immediately reject the pretrial services of Mr. Shapiro.

In April, 1976 hearings on preliminary matters, including motions, were conducted before Judge Alsop which hearings were attended by Mr. Francis X. Hermann, Assistant United States Attorney, by Mr. Shapiro and by the defendant personally. In the course of those hearings, which were characterized to some extent by verbal attacks by the defendant directed at the trial judge, it developed that Mr. Shapiro had received from the government all of the pretrial information that he needed. However, at the insistence of the defendant he withdrew all of the defendant's motions since the defendant was contending that the district court was without jurisdiction to try him. At one of the hearings the defendant discharged Mr. Shapiro and renewed his request to be represented by Daly or by certain other lay people who were members of an organization known as the Life Science Church of which defendant and Daly are ministers. That request was denied. The district court appointed Mr. Shapiro to serve as stand-by counsel for the defendant and directed Shapiro to attend the trial and to be available at all times should the defendant decide to accept his services or to call upon him for assistance. The case was set for trial on May 6, 1976.

2. *See In re Daly*, 291 Minn. 488, 189 N.W.2d 176 (1971).

3. The proceedings in the district court were affected substantially by the personality and views of Mr. Pilla as an individual. He, and others of like mind, are strongly opposed to the federal income tax. They also take the position that an individual involved in litigation, including criminal litigation, is entitled to be represented by lay counsel of his choice and that it is a violation of the Constitution of the United States for the practice of law in the state and federal courts to be limited to licensed attorneys in good standing. In April, 1974 Pilla and Jerome Daly, who has been mentioned, filed a civil suit in the district court for the purpose of establishing that alleged right. Similar suits were filed by other persons in other federal district courts in Alabama, Indiana, Pennsylvania, Texas and Wisconsin. Agreeable to multidistrict litigation procedures, a number of those cases, including the Minnesota case, were assigned to The Honorable Raynaldo G. Garza, Chief United States District Judge for the Southern District of Texas. In a well reasoned opinion Judge Garza found the claims of the plaintiffs to be without merit and dismissed all of the cases. *Turner v. American Bar Ass'n*, 407 F.Supp. 451 (N.D.Tex., W.D.Pa., N.D.Ind., D.Minn., S.D.Ala., W.D.Wis.1975). Pilla and Daly appealed their case to this court, and we affirmed principally on the basis of Judge Garza's opinion. *Pilla v. American Bar Ass'n*, 542 F.2d 56 (8th Cir. 1976). The Pilla-Daly case was pending before Judge Garza when Pilla was indicted in the instant case, and it was pending on appeal in this court when the defendant was tried in the district court. The position that the defendant assumed in the district court about his alleged right to be represented by Daly or other lay counsel was consistent with the position that he was maintaining in the Pilla-Daly litigation.

On that day the defendant appeared and filed a pro se motion for a dismissal of the indictment on the ground that he had been denied a speedy trial as guaranteed by the sixth amendment to the Constitution. That motion was denied, and the trial began. It was concluded on May 6.

Mr. Shapiro was present throughout the trial and was available to the defendant. Although the defendant stated repeatedly that he did not know how to defend himself, he steadfastly refused to accept the services of Shapiro and made repeated demands to be represented by lay counsel, notably Daly, who was present in the courtroom. Those demands were rejected.

Defendant's participation in the trial was negative, hostile and abusive toward the court to the point of contempt. The defendant refused to cross-examine government witnesses on the ground that he did not know how to do so. He called no witnesses and did not take the stand. He attempted to make a closing argument characterized by attacks on the trial judge and on the course of the proceedings. When Judge Alsop quite properly refused to permit the defendant to proceed along those lines, defendant closed his argument.

The district court instructed the jury as to the law of the case, and after short deliberation the jury found the defendant guilty. On July 20, 1976 the district court sentenced the defendant to imprisonment for one year. At the sentencing hearing the defendant took advantage of his right of allocution to deliver a final diatribe against the trial judge.

From what has been said it is clear that the case presented difficult problems of trial management, and we think that Judge Alsop handled those problems properly and with commendable patience and tact.

This appeal has been submitted to us without argument. We have before us, in addition to briefs filed by the government, the record in the case, including transcripts and exhibits, a brief filed on defendant's behalf by Mr. Shapiro, and a brief filed by the defendant pro se which may well have been prepared by Mr. Daly.

For reversal, the defendant brings forward a number of assignments of error, namely:

1. That the defendant was denied his right to a speedy trial.

2. That the district court erred in refusing to permit the defendant to be represented by lay counsel, including Daly.

3. That the district court erred in admitting certain evidence.

4. That the verdict and the judgment based thereon cannot be sustained because the seizure of defendant's property was illegal.

5. That the evidence was insufficient to sustain the verdict.

I

We take up, first, the claim that the evidence was insufficient to sustain the verdict. In evaluating that claim we view the evidence in the light most favorable to the government and are required to give to the government the benefit of all inferences favorable to it that may reasonably be drawn from the evidence, and ultimately the question is whether the verdict was sustained by substantial evidence. *United States v. McColgin*, 535 F.2d 471, 473 (8th Cir. 1976); *United States v. Wisdom*, 534 F.2d 1306, 1309 (8th Cir. 1976).

Apart from any ultimate inference of guilt or innocence, there is very little, if any, dispute about the facts of the case. The defendant resides in St. Paul and during the time with which we are concerned he was engaged in the business of commercial printing and engraving. He was operating under the trade name Collins Printing Company and was also operating A. J. Madsen Ruling & Binding Company, Inc. Both of those establishments were located on the same premises on East 5th Street which had been rented or leased by the defendant from the owner.

Defendant's place of business was in what appears to be a split level basement. The premises consisted of an office area, presumably containing furniture and fix-

tures, and a shop area containing machinery and various other items such as ink, dies, and paper stock of various kinds. The office area was some few feet higher than the shop area and was connected to the shop area by a short flight of stairs at the head of which there was a door leading to the office. Apparently, entrance to the basement could be effected by the use of an elevator from street level. There were also two other means of ingress and egress. One of those consisted of doors opening on a freight ramp. The other consisted of a "movable wall" which was hinged and could be pushed inward.

From at least June 30, 1969 through 1973 and thereafter the defendant was an employer of labor, and he was required to withhold from the wages of employees federal income taxes and social security taxes, to file returns reflecting his withholdings, and to account for and pay over the withholdings to the government periodically. The defendant withheld the taxes and filed the returns during the period above mentioned, but he did not pay the taxes shown by the returns to be due. Consequently, those taxes plus statutory penalty and interest were duly assessed by the IRS. For the period between June 30, 1969 and December 31, 1973 the total assessments against "Daniel M. Pilla, Collins Printing Co., 230 E. 5th St., St. Paul, Minn." amounted to $10,209.35. The assessment for the fourth quarter of 1973 was made on April 1, 1974 and amounted to $74.76. A. J. Madsen Ruling & Binding Co., Inc. filed no withholding tax returns for any period after the first quarter of 1972. Returns were filed by Madsen for the third quarter of 1968, the third quarter of 1969, the second quarter of 1971, and the first quarter of 1972. Total

assessments against that company amounted to $811.72.

Following its usual procedures the IRS made demands on the defendant for payment of the taxes in question and undertook to collect them by amicable means. The defendant did not deny that he owed the taxes, but in the course of earlier contacts between him and the IRS he professed to be financially unable to pay them.[4] However, as time went by the defendant's attitude toward his tax liabilities and toward the IRS changed and became belligerent. And by July, 1974 defendant had put up some signs in his place of business commanding federal agents and officers to stay out.

On July 9, 1974 defendant's file was turned over to Internal Revenue Officer Ronald Mills, and he was charged with the responsibility of collecting the taxes. Mills called on the defendant at his place of business, and the defendant called his attention to the signs which Mills had seen. The defendant told Mills that he was writing him a letter; Mills suggested that the letter be delivered to him at once as he was going to close down the premises the next day.

Mills took his departure, conferred with his superiors, and on July 10 prepared two notices of levy pursuant to 26 U.S.C. § 6331; one notice related to Collins Printing Co. and the other related to A. J. Madsen Ruling & Binding Co., Inc. Each notice set out the assessment history of the business concerned.

On July 11 Mills, accompanied by other agents, came to the defendant's place of business, served the notices of levy, and seized all of the property in the establish-

---

4. As this court has observed in earlier cases involving withholding taxes, it is not unusual for an employer who is undercapitalized or short of cash to find himself unable to meet net payrolls and operating expenses while at the same time making proper payments to the government of funds withheld from employees, and such an employer, if he wants to remain in business, simply does not pay over the withholdings, but uses them for his own purposes. It should be kept in mind that when an employ-

er takes that course of action, it does not affect adversely the tax situation of the employees; if there have been proper withholdings from wages, the employees are credited with the taxes withheld, and unless the government is able by one means or another to collect them from the employer or from some other responsible person, the tax revenues are simply lost. *See United States v. Paulton,* 540 F.2d 886 (8th Cir. 1976) and *Hartman v. United States,* 538 F.2d 1336 (8th Cir. 1976).

ment. The property was not removed from the building but was left therein pursuant to an arrangement between the IRS and the owner of the building. Seizure notices were placed on the office door and on the freight doors, and seizure tags were placed on the items of machinery in the shop.

Thereafter the defendant commenced a civil action in the district court seeking to obtain a temporary restraining order forbidding further proceedings under the levy.

On July 17 and July 24 the defendant was permitted to enter the premises in the company of Mills and certain items of property on which the government had no claim were released to him.

Defendant's civil suit was dismissed or at least his application for a temporary restraining order was denied. On July 29 Pilla went upon the premises and opened his establishment for business; one of his employees, Richard S. Nasby, was told by Pilla that he could return to work, and he did so.

The owner of the building notified Officer Mills as to what had happened, and Mills and Special Agent Donald Kirst of the Intelligence Division of the IRS went to the premises and found Nasby at work. They told him to leave, which he did, and the agents then inspected the premises and found that the warning signs had been removed from the doors and that the tags had been removed from the machinery to which they had been affixed. Defendant denied that he had removed the signs and tags personally, but it is clear that they were removed with his knowledge and consent. Before Mills and Kirst left the premises, they restored the signs and reaffixed the tags. On this occasion a sign was placed on the movable wall that has been mentioned as well as on the other entrances to the establishment.

Later, on July 29 and on July 30, the defendant was in telephonic contact with both Mills and Kirst. He told them in effect that his property had been seized illegally, and that regardless of what the court or the IRS might say he was going to deal with his property as he pleased. He was told that he must not enter the building without permission, and that if he removed anything from it, he would be subject to prosecution.

On August 5 the building was entered again and certain property was removed therefrom; this entry did not involve a removal of the signs or tags, but the signs were tampered with. Evidence was admitted from which the jury might have inferred and probably did infer that the defendant was the person who made the entry and removed the property.

Following the episode just described, the premises were put under surveillance. Shortly after noon on August 10, the date mentioned in the indictment, Special Agent Jon Hermann and Special Agent Urbanski had the premises under observation. They saw the defendant and his son park an automobile near the establishment and go into another place of business across the street.

After a time Special Agent Hermann and Special Agent Urbanski went to the premises and Hermann entered the basement and took station in the shop area which was dark. The door by which he gained ingress was locked behind him by Urbanski who returned to the original surveillance station. The two agents were in radio contact with each other.

After a few minutes Hermann was advised by Urbanski that the defendant had entered the building, and Hermann heard movement in the office area. At about that time the movable door was pushed slightly inward, and a person who was evidently the defendant's son slipped through the entrance, crossed the shop and entered the office area. The defendant then emerged from the office area and entered the shop, turning on a light as he did so. However, he did not observe Hermann.

The defendant remained in the shop about thirty seconds, gathered up an armload of material and returned to the office turning out the light in the shop. At this point the defendant was accosted by Special Agent Hermann who placed him under ar-

rest. The defendant voluntarily stated that he had come to the premises to pick up some of his "stuff," and he indicated some invoices and envelopes and some blank stock consisting of white and blue paper.

The district court instructed the jury fully and correctly on such matters as burden of proof, reasonable doubt, presumption of innocence, circumstantial evidence, and with respect to the weight of the evidence and credibility of witnesses.

■ The jury was told that the burden was on the government to prove beyond a reasonable doubt that the defendant had forcibly attempted or endeavored to rescue certain property; that the property had been seized by persons authorized to do so by virtue of their office; and that the defendant knew that the property had been seized.

The jury was instructed that to attempt to commit an offense means "willfully to do some act in an effort to bring about or accomplish something which the law forbids." As to the word "forcibly" appearing in the statute, the jury was told that the term was not limited to force exerted against persons but embraced any force used, and that sufficient force would have been shown if the jury found that the defendant "removed or caused to be removed Internal Revenue Service warning stickers." The jury was also told that for the purpose of showing that the property had been seized under the Internal Revenue Code, the government was required to show that it had been seized by persons authorized to do so by virtue of their office, and that one does not "rescue" property merely by taking it, but "by taking it with the realization that he is removing it from government custody."

As to the knowledge and intent of the defendant the jury was instructed: "Finally, an act is done knowingly if done voluntarily and intentionally and not because of mistake, or accident or other innocent reason. To satisfy the mental state requirement of the statute here charged in the indictment, it must be proved that the defendant purposefully, as opposed to mistakenly, attempted to retake property knowing that it had been seized by the Internal Revenue Service."

The defendant did not object to the instructions of the district court and no objection to them as such has been made here. In our view they were supported by the decisions in *United States v. Oliver,* 421 F.2d 1034, 1036–37 (10th Cir. 1970); and *United States v. Scolnick,* 392 F.2d 320 (3d Cir.), *cert. denied,* 392 U.S. 931, 88 S.Ct. 2283, 20 L.Ed.2d 1389, *sub nom. Brooks v. United States* (1968). They were not contrary to what was said in the early case of *Cooper v. United States,* 299 F. 483 (3d Cir. 1924), which was decided under a statute quite similar to what is now 26 U.S.C. § 7212(b). *See also United States v. Heck,* 499 F.2d 778 (9th Cir.), *cert, denied,* 419 U.S. 1088, 95 S.Ct. 677, 42 L.Ed.2d 680 (1974).[5] We find no plain or manifest error in the instructions.

■ There is no question in this case as to what the defendant actually did. And bearing in mind the fact that he was not accused of actually rescuing any property but only with attempting to do so, we think that the jury was justified in finding, although it was not required to find, that the conduct of the defendant on August 10 constituted an unlawful attempt to forcibly rescue property that had been seized under the Internal Revenue Code.

We hold, therefore, that the district court did not err in submitting the case to the jury, and that the jury's verdict was sustained by substantial evidence.

## II

We next consider the contention that the verdict cannot stand because the underlying seizure was illegal.

In addressing ourselves to this question we will assume that in a case of this kind the government must prove that the seizure was legal in the sense that it was in accordance with prescribed procedures and was

---

5. There are very few reported opinions dealing with alleged violations of § 7212(b).

effected by officers having authority to make the seizure. There is no doubt about those things in this case; nor has there ever been any doubt that the defendant owed the taxes involved in the case.

■ The defendant's argument boils down to the proposition that 26 U.S.C. § 6331 is unconstitutional because it permits a seizure of property without prior judicial proceedings. That argument has been out of date since the Supreme Court decided *Phillips v. Commissioner of Internal Revenue,* 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931), more than forty-five years ago. *See Fuentes v. Shevin,* 407 U.S. 67, 90–92, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Kalb v. United States,* 505 F.2d 506, 510 (2d Cir. 1974); and *Tavares v. United States,* 491 F.2d 725 (9th Cir. 1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1120, 43 L.Ed.2d 394 (1975).

### III

The defendant argues that the district court erred in admitting evidence establishing that the defendant had not paid a substantial amount of taxes and evidence as to the procedures that were followed by the Internal Revenue Service in undertaking to effect collection from the defendant prior to the seizure. It is said that admission of this evidence was plain error which may be reviewed here under Fed.R.Crim.P. 52(b) although no objection was made to the evidence in the district court. We do not agree.

■ The government was required to prove the seizure that took place on July 11, and we think that it was entitled, and may have been required, to show the basis for the seizure which was the tax liability of the defendant extending over a period of several years. The notices of levy which have been mentioned were clearly admissible, and they showed the amounts of the assessments. It must be remembered that the government seized all of the property contained in the defendant's establishment, and the jury was entitled to know that the seizure was based on a substantial and not a trivial tax liability.

The cases cited by defendant, *Mares v. United States,* 383 F.2d 811 (10th Cir. 1967), and *South v. United States,* 368 F.2d 202 (5th Cir. 1966), are not in point since the offenses charged in those cases had nothing whatever to do with the internal revenue laws or tax liabilities of the defendants.

■ With respect to the evidence as to defendant's dealings with the Internal Revenue Service or as to its dealings with the defendant prior to July 11, 1974, it appears to us that this evidence tended to show the defendant's general attitude toward the federal tax laws and to the IRS and was relevant as bearing on his motive and intent when he entered the premises on August 10, 1974.

■ Nor do we think that the district court erred in permitting the government to introduce evidence with respect to the July 29 entry and as to the August 5 entry and evidence tending to indicate that the defendant was the person who entered the premises on the latter date and removed property therefrom.

It is quite true that ordinarily evidence of other crimes is not admissible to prove guilt of a particular crime charged. There are, however, exceptions to that rule, and one of them is that evidence of other crimes is admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b).

The evidence as to the defendant's involvement in the August 5 episode fell within the exception just mentioned, it was admitted for an appropriately limited purpose, and the jury was adequately cautioned by the trial judge as to the purpose for which it could consider the evidence.

### IV

We reject defendant's contention that he was denied a speedy trial, and that the denial required a dismissal under the holding in *Strunk v. United States,* 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973).

The defendant was indicted, arraigned and put to trial prior to the effective date of the time limitations appearing in the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161 *et seq.* Consequently, his contention must be measured by the sixth amendment itself as implemented by Fed.R. Crim.P. 48(b); and the matter addressed itself to the discretion of the district court. 3 C. Wright, Federal Practice & Procedure, Criminal, § 814 at 319 (1969).

The lapse of time between the return of the indictment in November, 1974 and the beginning of the trial on May 4, 1976 was not due to any fault or bad motive on the part of the government; it was due in part to the actions taken by the defendant shortly after the indictment was returned; no demand for a speedy trial was made until just before the trial began, and we are satisfied that the defendant was not prejudiced by the delay in any way.

In such circumstances we see no abuse of discretion on the part of the district court in denying the motion to dismiss for lack of a speedy trial.

## V

In view of our holding in *Pilla v. American Bar Ass'n,* 542 F.2d 56 (8th Cir. 1976), the district court did not err in refusing to permit the defendant to be represented by Mr. Daly or by other lay counsel suggested by him.

*Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), cited by the defendant, simply holds that a defendant in a criminal case is entitled to represent himself and may not have counsel thrust upon him by the trial court. The case does not hold that a defendant who is unwilling to be represented by a licensed attorney is entitled to the assistance of lay counsel or of an attorney who has been disbarred or suspended from practice.

We do not think that defendant's right of self-representation which was recognized by the district court was violated by the part that Mr. Shapiro played in the case. While he was present and was availa-

ble to the defendant, he did not participate in the trial in any way. We see nothing objectionable in the appointing of stand-by counsel as was done in this case. Such an action is a wise precaution against the contingency that may arise should the defendant change his mind in the middle of a trial and decide that he wants counsel.

In his excellent brief filed with us Mr. Shapiro contends that in any event the district court failed to warn the defendant adequately of the consequences that would or might result should he go to trial without counsel. We disagree. The defendant was fully advised of his right to counsel, but that he could not be represented by lay counsel. He knew that if he refused to accept the services of Mr. Shapiro or another licensed lawyer, he would have to go to trial without counsel. He was well aware and stated repeatedly that he did not know how to defend himself in a criminal trial. We are satisfied that the defendant intelligently, voluntarily and effectively waived his constitutional right of representation.

From our consideration of the record as a whole, we are convinced that the defendant received a fair trial, and that the verdict of the jury was supported by the evidence. We affirm the judgment of the district court.