**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert MAIN, Defendant-Appellant.**

**No. 77–2232.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 28, 1979.

Decided May 11, 1979.

Rehearing Denied June 22, 1979.

---

George Kaye, Paxton, Ill., for defendant-appellant.

Warren E. White, Danville, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, and PELL and BAUER, Circuit Judges.

PELL, Circuit Judge.

This case raises an issue expressly reserved by the Supreme Court in *G. M. Leasing Corp. v. United States,* 429 U.S. 338, 359, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977): whether property seized by agents of the Internal Revenue Service without a warrant must be excluded from a subsequent criminal prosecution under the tax code. In order to decide this case, however, only one aspect of that issue need be considered, i. e., the retroactive effect of an exclusionary rule based on *G. M. Leasing.* The prosecution before us was for violations of I.R.C. § 7212(b), 26 U.S.C. § 7212(b).[1]

## I. Factual Background

The defendant, Robert Main, was an incorporator, president, and registered agent of Main Cob Company, Inc. (the corporation). The corporation was the taxpayer involved in the I.R.S.'s collection investigation.

The corporation was formed in 1966, having been incorporated under Illinois law by the defendant, his wife (Bettie Main), and Mary Hansen, not a relative of the Mains. Forty-eight per cent of the stock was held by the Mains' children and fifty-two per cent by Mary Hansen and her children. From the record it appears that the corporation's main business was the buying of corn cobs and hauling them to a local plant where they were sold for processing. The corporation apparently conducted its business from the Mains' residence near Gibson City, Illinois. The corporation owned that residence prior to September 1973, when the property was conveyed by a quit-claim deed to John Main, son of the defendant and Bettie Main. According to Bettie Main's testimony the corporation ceased doing business late in 1975. It was dissolved on December 1, 1976, by the State of Illinois for failure "to file an annual report and pay an annual franchise tax."

In May 1976, the I.R.S. assessed the corporation for unpaid highway use taxes, 26 U.S.C. §§ 4481 *et seq.,* due between January 1970 and September 1974 and totalling $6,425.57. On July 23, 1976, a final notice before seizure was sent to the corporation. On August 24, the I.R.S. filed a notice of federal tax lien with the Recorder of Deeds of Ford County, Illinois, against the corporation for the May highway use tax assessments. On September 2, the corporation's account was assigned to Revenue Officer Tom McAuley for collection.

On October 7, 1976, a second notice of federal tax lien was filed for the highway use taxes and on October 13, McAuley and three other agents visited the defendant's residence. The defendant met the agents outside the house and McAuley demanded payment of the tax assessments. The defendant told McAuley he would have to collect the taxes from the corporation. McAuley replied that as far as he was concerned the defendant was the corporation. The agents then affixed seizure notices to a number of trucks and semi-trailers in the yard and to a 1975 Oldsmobile, used by the

---

1. § 7212(b) provides:

    (b) Forcible rescue of seized property. Any person who forcibly rescues or causes to be rescued any property after it shall have been seized under this title, or shall attempt or endeavor so to do, shall, excepting in

    cases otherwise provided for, for every such offense, be fined not more than $500, or not more than double the value of the property so rescued, whichever is the greater, or be imprisoned not more than 2 years.

defendant as his personal automobile.[2] According to McAuley, the defendant became upset at this and made threatening gestures, at which the agents withdrew. A notice of seizure, inventorying the vehicles tagged, was sent to the corporation at the Mains' address and the certified mail receipt was returned to McAuley signed by Bettie Main.

On October 29, the I.R.S. assessed the corporation for unpaid employee income tax withholdings, 26 U.S.C. §§ 3401 *et seq.,* and unpaid unemployment taxes, 26 U.S.C. §§ 3301 *et seq.,* totalling $57,669.80, and on November 5, notices of federal tax liens were filed for these taxes. During this period, McAuley learned that the corporation had entered into a contract to purchase a house in Gibson City which was being used as rental property.

The events which led to the defendant's prosecution began on November 11, 1976. McAuley called the Mains' house at approximately 8:00 a.m. and was told by Bettie Main that the defendant was gone for the day. At about 9:30 a.m., McAuley arrived at the Main residence with five other agents. He attempted to give Bettie Main some papers, including a copy of the October 13 notice of seizure and a release of all items previously seized, except the 1975 Oldsmobile. The Oldsmobile was parked in the driveway a few feet from the house and some twenty feet off the public road. Bettie Main asked McAuley whether he had a warrant and he told her he did not and did not need one. Acting on the earlier advice of her attorney, she refused to accept or sign a copy of the release, locked the Oldsmobile, and went into the house. McAuley left the papers inside a rear storm door of the house. According to Bettie Main and two of her children, the agents then walked around the house, out into a fenced side lot, and looked into and entered a garage and barn, before leaving the premises.

After leaving the Main residence, the agents went to Gibson City to make arrangements for towing the Oldsmobile. In addition, McAuley and another agent went to the rental property in Gibson City to post notices of seizure there. At the rental house, the agents identified themselves to the tenant, Alma Day, and told her their purpose. Mrs. Day said, "Come on in." Inside, the agents taped a notice of seizure to the inside of the window of the back door and proceeded to the front of the house. There, Mrs. Day requested that they tape the notice to the front window, rather than the door, so that her children would not tear the notice off. The agents complied with that request, served Mr. Day with a notice to pay rent to the I.R.S. when due, and left. The agents returned to the Main residence about 11:30 a. m. with a tow truck from Gibson City. They found the Oldsmobile still locked and parked in the driveway. The agents entered upon the Mains' premises with the tow truck operator and under their direction the car was towed to a garage in Gibson City for storage pending its sale.

The following morning, November 12, 1976, the defendant went to the garage where the Oldsmobile was being stored. Upon learning that the automobile was there, the defendant told the garage mechanic that he would be back. The mechanic told the defendant that the I.R.S. agents had instructed him to tell the defendant that it was unlawful for the defendant to remove the automobile, but that if the defendant wanted to do so, the mechanic was not to resist him. The defendant left, but returned half an hour later, opened the rear door of the garage, and drove the Oldsmobile away. Count I of the indictment charged the defendant with forcible rescue of the Oldsmobile.

Count II charged the defendant with forcible rescue of the rental house in Gibson City. The remaining facts leading to that charge are as follows. On or about December 9, 1976, the Days sent the monthly rental payment to the I.R.S. A few days later, the defendant called at the house to collect the rent and was informed of the seizure and the payment to the I.R.S. The

---

**2.** See note 3, *infra.*

defendant went through the house, tore down the notices of seizure, and told the Days to resume paying the rent to him. When the defendant left, Mr. Day called the I.R.S. and was told not to start trouble with the defendant and to go ahead and pay the rent to him until a new notice was posted.

The defendant was tried before a jury and found guilty on both counts. He was sentenced to imprisonment for one year on each count to run concurrently.

## II. The Elements of Forcible Rescue

The defendant's two main contentions involve the lawfulness of the warrantless seizure of the Oldsmobile and the rental house by the I.R.S. agents. The first contention is that in order to prove that the defendant forcibly rescued property, the Government must show that the property had been seized lawfully. The defendant relies on *Cooper v. United States*, 299 F. 483 (3d Cir. 1924), for the proposition that, "lawful seizure . . . is a prerequisite [to unlawful rescue]. And the lawfulness of the seizure must be shown." *Id.* at 484. The defendant, relying on *G. M. Leasing,* contends that the seizure was unlawful because the agents failed to obtain a warrant. But defendant has failed to recognize that the court in *Cooper* went on to say that one way to show the lawfulness of a seizure is to show that it was performed by one authorized to do so by virtue of his office. 299 F. at 485. Thus lawfulness of a seizure under § 7212(b) means only that it was performed by a proper official with general authority under the tax code to make the seizure; disputes over other aspects of the legality of the seizure are irrelevant to the elements of the crime of forcible rescue. As this court has noted, "If the rule were otherwise it would 'encourage violent self-help where civil remedies are admittedly available.' *United States v. Scolnick,* 392 F.2d [320, 326 (3d Cir.), *cert. denied sub nom. Brooks v. United States,* 392 U.S. 931, [88 S.Ct. 2283, 20 L.Ed.2d 1389] (1968)]." *United States v. Harris,* 521 F.2d 1089 (7th Cir. 1975). Here, it was shown that the seizure was made by agents of the I.R.S. and, therefore, was made "under [the Internal Revenue Code]" as required by § 7212(b). *United States v. Harris* indicates that the elements of the crime of forcible rescue, under § 7212(b), are: (1) seizure of property by one authorized to do so under the Internal Revenue Code, (2) the defendant's knowledge that the property has been so seized, and (3) a forcible retaking of the property by the defendant. The evidence supports the jury's verdict on each of these elements and, indeed, the defendant does not appear to dispute the facts as we have stated them, arguing only for a different interpretation of the first element above.[3]

Underlying the defendant's contention that the Government must show the seizure to have been lawful in all respects is his notion that he had the right to determine for himself that the seizures were unlawful and to remedy that situation by

---

**3.** The defendant has raised two subsidiary issues regarding the lawfulness of the seizures in this case. First, the defendant contended in the district court and maintains here that the 1975 Oldsmobile was never owned by the corporation, but was his personal property. Second, he argues that because the corporation was dissolved by the state on December 1, 1976, prior to the day he entered the rental house, and removed the seizure notices, the interests of the corporation in the contract to purchase the rental house, which were what the I.R.S. seized, no longer existed, so that there was nothing for him to rescue. Both arguments miss the point of § 7212(b). As to the Oldsmobile, the actual ownership was disputed. The certificate of title showed the corporation as owner on the date of the seizure. On the application for that certificate of title, the defendant himself wrote, in the space marked Written Signature of Owner, "Main Cob Co. Inc., Robert Main." The day after the seizure, the defendant applied for a corrected title which then showed him as sole owner. Regarding both the car and the rental house, the I.R.S. had concluded that the corporation was the defendant's alter ego. If the I.R.S. was correct, a point we need not decide here, then the corporation would have "no countervailing effect," and the defendant would be liable for its unpaid taxes. *G. M. Leasing v. United States, supra,* 429 U.S. at 351,·97 S.Ct. 619. The point of § 7212(b) is that legal questions such as these are not to be settled by self-help, but by the civil remedies provided in the statute.

retaking the property. This underlying assumption of a right to self-help finds some support in case law. *See Wainwright v. City of New Orleans,* 392 U.S. 598, 88 S.Ct. 2243, 20 L.Ed.2d 1322 (1968) (opinions of Warren, C. J., and Douglas, J., dissenting from the dismissal of certiorari; the case involved the right to resist unlawful arrest); *United States v. Di Re,* 332 U.S. 581, 594, 68 S.Ct. 222, 92 L.Ed. 210 (1948) (right to resist unlawful arrest); *Bad Elk v. United States,* 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874 (1900) (same); Prosser, Law of Torts § 22 (4th ed. 1971) (right to recapture chattel). These rules allowing for self-help are based upon the common law and rooted in the concept of self-defense. The difficulty with the defendant's reliance on such underlying assumptions is that these common law rules of self-help have been altered by the very statute under which the defendant has been convicted. Section 7212(b) represents a legislative determination that in the context of the enforcement of the tax laws, once property has been seized, the risk of disorder by violent recovery of the property should be avoided entirely and the one who claims the right to the property should pursue legal remedies. *See also* Ill. Ann.Stat. ch. 38, § 7–7 (Smith-Hurd 1972) (person may not resist arrest, lawful or unlawful, by known police officer); N.Y.Penal L. § 35.27 (McKinney 1975) (same).[4] This policy decision by Congress was recognized in our construction of the elements of § 7212(b) in *Harris, supra,* and the requirement of a warrant under *G. M. Leasing,*

*supra,* does not affect the balance struck by the statute.

## III. The Suppression Issue

That brings us to the defendant's second main contention and a fuller consideration of the effect of *G. M. Leasing* on the defendant's conviction. In that case I.R.S. agents seized a number of automobiles owned by G. M. Leasing Corporation, which the agents considered to be the alter ego of the taxpayer. "None of the cars was on property in which [G. M. Leasing] had an interest." 429 U.S. at 344, 97 S.Ct. at 624. In addition, the agents entered upon premises rented by G. M. Leasing for its offices, forcibly entered a cottage on the property used as the office, and seized the contents of the cottage, including books and records. The Supreme Court held that the seizure of the automobiles from places other than on G. M. Leasing's property was authorized by the I.R.S.'s power to collect taxes by "distraint and seizure by any means," 26 U.S.C. § 6331(b),[5] and no warrant was required. But the Court distinguished the seizure of the contents of the cottage saying:

It is one thing to seize without a warrant property resting in an open area or seizable by levy without an intrusion into privacy, and it is quite another thing to effect a warrantless seizure of property, even that owned by a corporation, situated on private premises to which access is not otherwise available for the seizing officer.

. . . by levy upon all property and rights to property . . . belonging to such person or on which there is a lien provided in this chapter for the payment of such tax.

. . .

(b) Seizure and sale of property.—The term "levy" as used in this title includes the power of distraint and seizure by any means. A levy shall extend only to property possessed and obligations existing at the time thereof. In any case in which the Secretary or his delegate may levy upon property or rights to property, he may seize and sell such property or rights to property (whether real or personal, tangible or intangible).

. . .

4. The Practice Commentary to the New York provision, added in 1968, contains a detailed exposition of the legislative policy decision which changed the common law rule in the arrest situation. Practice Commentary, N.Y. Penal L. § 35.27 (McKinney 1975). *See People v. Lattanzio,* 35 A.D.2d 313, 316 N.Y.S.2d 163 (3d Dept.1970) (holding § 35.27 constitutional as a reasoned exercise of the police power to protect the safety of both police officers and the citizenry).

5. 26 U.S.C. § 6331 reads in part:
   (a) Authority of Secretary or delegate.—If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary or his delegate to collect such tax

429 U.S. at 354, 97 S.Ct. at 629–630. The Court concluded that a warrant was required in order to enter private property for the purpose of seizing goods in satisfaction of tax liabilities, and said:

> The intrusion into petitioner's office is therefore governed by the normal Fourth Amendment rule that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." (Citation omitted.)

*Id.* at 358, 97 S.Ct. at 631. The court found it unnecessary to decide whether the unlawful seizure of the contents of the cottage required suppression of the seized items in any subsequent prosecution because G. M. Leasing had not been prosecuted and the issue was, therefore, premature.

We need decide only one aspect of the issue reserved in *G. M. Leasing,* that being whether, even if the exclusionary rule ap-

plies, the case should be given retroactive effect. The seizures in this case took place in November 1976. The decision in *G. M. Leasing* was handed down on January 12, 1977. Therefore, if the case is to be applied prospectively only, evidence of the seizures here was properly admitted.[6]

■ Applying "normal Fourth Amendment rule[s]" to the facts of this case, it appears that the entry into and seizure of the rental house was lawful because the tenants consented to the entry, *see United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974),[7] but that the entry upon the Mains' property and seizure of the Oldsmobile was unlawful in the absence of a warrant, *see Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).[8] We need not make a detailed analysis of the legality of the seizures, however, because the evidence of these seizures, even if unlawful under *G. M. Leasing,* need not have been excluded from the defendant's

---

**6.** The admissibility of evidence of the seizure is important, of course, because if the evidence must be suppressed, the Government would be unable to show that the rescued property had been seized at all. The difficulty would be similar to that in a drug possession case in which evidence of the unlawful seizure of the drugs had to be suppressed. *Cf. United States v. Peltier,* 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975) (discussed *infra* ).

**7.** While it has been held that a landlord may not consent to a search of a house rented to another, *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), or a hotel clerk authorize a search of a customer's room, *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), it is not the respective property rights involved that control, but the consenter's "authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). *Matlock* approved consent by third parties with equal possessory and privacy interests in the premises to those of the defendant. It would seem to follow *a fortiori* that the tenant, whose possessory and privacy interests are superior to the landlord's, should be able to give valid consent at least to the entry by the agents. Once validly admitted to the premises, *G. M. Leasing* appears to hold that a warrantless seizure, by posting the seizure warnings, would be authorized by § 6331. 429 U.S. at 352, 354, 358, 97 S.Ct. 619.

**8.** We note that the I.R.S. has concluded that under *G. M. Leasing,* a warrant is required in order "to seize a vehicle from a taxpayer's front yard, driveway, or carport." I.R.S. Manual, Supp. 5G–88, at p. 9433–5 (CCH December 15, 1977). The Government argues here that the warrantless entry and seizure in this case can be justified under the "plain view," "open-fields," and so-called "automobile" exceptions to the warrant requirement. The main difficulty with these arguments is the striking similarity between the facts (as to the location and circumstances of the automobile) here and in *Coolidge, supra,* where these arguments were considered and rejected. The *Coolidge* distinction between automobiles on the highway or in public places and those parked on private property was recognized again in *Cardwell v. Lewis,* 417 U.S. 583, 593, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). We, however, will confront the "plain view" issue at such time as it may be appropriate for reaching a decision and then upon the particular facts presenting the issue. In addition, in disputing the legality of the physical seizure of the Oldsmobile on November 11, the parties have not raised the possible effect of the earlier tagging of that car by the agents on October 13. In view of the result we reach on the retroactivity issue, there is no need to consider this point and we express no opinion on it.

prosecution for forcible rescue. Because our decision is based solely on the nonretroactivity of the rule in *G. M. Leasing,* we need not decide the broader question of the applicability of the exclusionary rule apparently left open by the Court in that case.

Guidance for our decision of the retroactivity issue is found in *United States v. Peltier,* 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). The issue in that case was similar in many ways to the one presented here. *Peltier* involved the question whether the rule in *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), holding that warrantless searches conducted by roving Border Patrol agents 25 miles from the border were unconstitutional, should be applied to such searches conducted before the date of the decision in *Almeida-Sanchez.* In concluding that *Almeida-Sanchez* should not be given retroactive effect, the Court in *Peltier* analyzed previous retroactivity cases. It found that no decision excluding evidence "in order to enforce a constitutional guarantee that does not relate to the integrity of the factfinding process" had ever been held retroactive. The Court then analyzed the effect of a retroactivity holding on the deterrence and judicial integrity rationales for the exclusionary rule. The primary focus of the Court's analysis of both of these rationales was on "[whether] the law enforcement officer had knowledge, or may properly be charged with knowledge that the search was unconstitutional under the Fourth Amendment." 422 U.S. at 542, 95 S.Ct. at 2320. *Accord United States v. Berry,* 571 F.2d 2 (7th Cir.), *cert. denied sub nom. Richardson v. United States,* 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978). The Court noted that the Border Patrol

agents in *Peltier* had relied in good faith on a statute and administrative regulations which had long been construed to allow warrantless searches within 100 air miles of any external boundary of the United States and had been upheld consistently by the courts. 422 U.S. at 539–542, 95 S.Ct. 2313. For that reason, the Court concluded that retroactive application of the exclusionary rule would have no deterrent effect and that failure to apply it retroactively would not involve the courts in willful violations of the Constitution.

The similarities to the present case are striking. Here too the I.R.S. agents acted pursuant to a statute enacted by Congress, 26 U.S.C. § 6331, and the I.R.S. Manual, neither of which required a warrant to enter private property to effect a tax seizure.[9] And as the Court observed in *G. M. Leasing,* similar statutory authority has been provided by Congress since 1791. 429 U.S. at 354, 97 S.Ct. 619. The courts have consistently upheld these provisions. *See e. g. United States v. Pilla,* 550 F.2d 1085, 1091–1092 (8th Cir.), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2954, 53 L.Ed.2d 1080 (1977); *Mason v. Rollins,* 16 Fed.Cas. Case No. 9,252, 1061, 1063 (C.C.N.D.Ill.1869). Thus, as in *Peltier,* "we cannot regard as blameworthy those parties who conform their conduct to the prevailing statutory or constitutional norm." (Footnote omitted) 422 U.S. at 542, 95 S.Ct. at 2320. And, as in *Peltier,* the conclusion follows that neither these revenue officers nor others in the future will be deterred from making unlawful seizures by excluding evidence of these seizures, made in good faith reliance on established legal rules; nor will the "imperative of judicial integrity" be offended by admission of evidence of such seizures.

---

**9.** The I.R.S. Manual has been revised to reflect the decision in *G. M. Leasing.* There is now a separate part dealing with seizures on private property. I.R.S. Manual ¶ 5342 (CCH Nov. 20, 1978). That part begins:

5342.1
General
(1) The Supreme Court of the United States held in *G. M. Leasing v. United States* (citation omitted) that a warrantless entry onto the private areas of personal or business

premises of a taxpayer for the purpose of seizing property to satisfy a tax liability is in violation of the Fourth Amendment to the Constitution of the United States. As a result, before such seizures are made, revenue officers must either secure the taxpayer's written consent to entry or a court order permitting the entry. . . .
*See also* I.R.S. Manual Supps. 5G–85, (CCH August 15, 1977) and 5G–88 (CCH December 15, 1977).

### IV. The Sentence

The defendant also contends that the sentence of imprisonment for one year on each count, to run concurrently, was excessive. The defendant points out that the defendant in *United States v. Harris, supra,* 521 F.2d at 1091, was sentenced to only forty minutes in the custody of the United States ·Marshal. *But cf. United States v. Pilla, supra,* 550 F.2d at 1088 (defendant convicted of one count of forcible rescue sentenced to one year). He argues that the sentencing judge gave insufficient weight to certain circumstances which he regards as mitigating.

■ The general rule on review of sentences in the federal courts is: "once it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end (footnote and citations omitted)," unless the sentencing judge relied on improper or unreliable information in exercising his or her discretion, or failed to exercise any discretion at all, in imposing sentence. *Dorszynski v. United States,* 418 U.S. 424, 431, 443, 94 S.Ct. 3042, 3047, 41 L.Ed.2d 855 (1974); *United States v. Tucker,* 404 U.S. 443, 446–447, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972); *United States v. Cardi,* 519 F.2d 309, 311–312 (7th Cir. 1975). Section 7212(b) authorizes imprisonment for up to two years upon conviction of forcible rescue. Since the defendant was convicted on two counts under the statute, he could have been sentenced to a total of four years imprisonment. Thus the sentence of one year terms to run concurrently is well within the limits of the statute.

■ The defendant does not contend that the sentencing judge considered improper information in setting the sentence or that he failed to exercise his discretion at all. The sentencing transcript shows that the court considered the pre-sentence report and letters sent to the judge on the defendant's behalf. The defendant's real dispute with·the district court is over the weight to be given to the various factors considered. The cases cited above make clear that that is a matter for the sentencing court's dis-

cretion, with which this court will not interfere. *See also United States v. Foss,* 501 F.2d 522, 529 (1st Cir. 1974).

We have considered defendant's other contentions and found them to be without merit.

For the reasons hereinbefore set out, we affirm the judgment of the district court.