[Cite as *State v. Wooten*, 2016-Ohio-6980.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

AMANDA GAIL WOOTEN,

    DEFENDANT-APPELLANT.

CASE NO. 9-15-46

O P I N I O N

Appeal from Marion County Common Pleas Court
Trial Court No. 15-CR-129

Judgment Affirmed

Date of Decision: September 26, 2016

APPEARANCES:

    *Clifford C. Spohn* for Appellant

    *Denise M. Martin* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Amanda Wooten ("Wooten") brings this appeal from the judgment of the Court of Common Pleas of Marion County denying her motion to suppress. For the reasons set forth below, the judgment is affirmed.

{¶2} On March 13, 2015, Howard Hammons ("Hammons") called the Marion County Sheriff's office and requested the police to come to his house and "raid" it because there were people in the home who were smoking crack cocaine. Hammons gave the officers permission to enter the home. Members of the drug task force came to the home and entered without a search warrant, but with Hammons' permission. They went to the second floor of the home and observed crack cocaine and drug paraphernalia. At that time, Wooten made self-incriminating statements.

{¶3} On March 26, 2015, the Marion County Grand Jury indicted Wooten on one count of possession of cocaine in violation of R.C. 2925.11(A)/(C)(4), a felony of the fifth degree. Doc. 1. Wooten filed a motion on May 13, 2015, to suppress all of the evidence seized by the officers during the warrantless search. Doc. 25. The trial court held a hearing on the motion on July 9, 2015. Doc. 33. On July 10, 2015, the trial court entered judgment denying the motion to suppress. *Id*. On July 21, 2015, Wooten changed her plea to one of no contest. Doc. 35. The trial court accepted the plea and found Wooten guilty as charged in the indictment. Doc. 38. A sentencing hearing was then held on November 9, 2015. *Id.* The trial court

then sentenced Wooten to two years of community control. *Id.* Wooten appealed

from this judgment and raises the following assignment of error on appeal.

> **The trial court erred when it overruled [Wooten's] motion to suppress all evidence seized, collected, observed, photographed or recorded.**

{¶4} The sole assignment of error challenges the constitutionality of the

warrantless search. Wooten alleges that since she "occupied two rooms on the

second floor of the house", Hammons had no authority to grant permission to search

those rooms to the officers. Appellant's Brief, 8. "An appellate review of the trial

court's decision on a motion to suppress involves a mixed question of law and fact."

*State v. Fittro*, 3d Dist. Marion No. 9-14-19, 2015-Ohio-1884, ¶ 11.

> **When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Fanning* (1982), 1 Ohio St.3d 19, 1 OBR 57, 437 N.E.2d 583. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. *State v. McNamara* (1997), 124 Ohio App.3d 706, 707 N.E.2d 539.**

*State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

{¶5} The Fourth Amendment to the United States Constitution guarantees

people the right to be secure in their homes against unreasonable searches and

seizures. "[S]earches and seizures inside a home without a warrant are

presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). "Once a warrantless search is established, the burden of persuasion is on the state to show the validity of the search." *Xenia v. Wallace,* 37 Ohio St.3d 216, 218, 524 N.E.2d 889, (1988). However, the warrant requirement is subject to certain exceptions, including consent to a search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed. 854 (1973) (searches conducted to valid consent are constitutionally allowed).

{¶6} "Generally, consent to search a person's residence may be obtained from a third party who possesses common authority over, or other sufficient relationship to, the premises." *State v. Telshaw*, 195 Ohio App.3d 596, 2011-Ohio-3373, 961 N.E.2d 223, ¶ 16 (7th Dist.).

> **Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third party consent does not rest upon the law of property, with its attendant historical and legal refinements, * * * but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.**

*U.S. v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). A landlord does not have the actual authority to consent to a search of the private quarters of a tenant. *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961).

{¶7}    At the suppression hearing, the State presented the testimony of three witnesses.  Detective Nate Hildreth ("Hildreth") of the Marion County Sheriff's Office testified that he received a phone call from Hammons indicating that "people in his house [were] using [crack]" and that he wanted the police to come to the home and "make it look like a raid."  Tr. 4-6.  Hildreth testified that Hammons indicated that the house was his.  Tr. 6.  Hildreth then went to the house and removed Hammons from the home, taking him to Hildreth's vehicle.  Tr. 7.  Hammons again indicated he owned the home and did not indicate that any of the people inside were renters.  Tr. 7.

{¶8}    Lieutenant Mike Wheeler ("Wheeler") of the MARMET drug task force testified that he was advised by Hildreth that Hammons was the owner of the home and that Hammons had indicated there were people in the upstairs of the residence smoking illegal narcotics.  Tr. 8-9.  Hammons had given the task force "permission to enter the home as if it were a raid."  Tr. 9.  Upon arriving at the home, Wheeler entered through a side door and saw Hammons sitting on a couch.  Tr. 10.  Wheeler then went up the stairs of the home pursuant to the permission granted by Hammons.  Tr. 12.  When he reached the top of the stairs, Wheeler saw an auxiliary living room and a doorway that went into another room.  Tr. 12.  Wheeler did not recall if there was a door at the top of the stairs, but indicated that if there had been one, it was open as he did not have to open anything to see into the rooms upstairs.  Tr. 13.  When Wheeler got to the top of the stairs he saw an elderly

gentleman on the couch and saw Wooten in the other room through the open door with her back to him and her hands in the front of her pants. Tr. 13. Not knowing if she had a weapon, Wheeler ordered Wooten to turn around to face him. Tr. 14. Wheeler then approached Wooten and she pulled two crack pipes out of her pants and placed them on the bed. Tr. 15. Wooten then offered to cooperate in order to help herself out. Tr. 15. She told Wheeler where the crack was and admitted that she had been smoking crack. Tr. 15. At no time did Wooten indicate that she did not wish for the search to continue. Tr. 18.

{¶9} On cross-examination Wheeler testified that Hammons stated that he slept on the couch in the downstairs living room. Tr. 21. A second living room was in the upstairs. Tr. 22. Wheeler indicated that the only restroom was downstairs and he did not consider the upstairs to be a separate apartment. Tr. 24. Hammons never indicated to him that anyone was renting the upstairs. Tr. 25.

{¶10} Hammons testified for the State that he was living in the home along with Wooten and another person. Tr. 27. Hammons testified that he called the police because there was drug activity occurring in his home and he did not want it to continue. Tr. 27. According to Hammons, Wooten and the other tenant had been living with him for two to three months and used the bathroom and kitchen downstairs. Tr. 28. Hammons indicated that he had "papers in the closet as you go up the steps, closet to the left." Tr. 29. Hammons indicated that he has had access to the room set up as a living room. Tr. 29. Hammons testified that he considered

the two rooms in the upstairs to be their living quarters, but "if [he] were to go up there and get something out of [his] closet we had an agreement between [Hammons] and David I could do that so --". Tr. 29-30. Hammons denied ever telling the police that anyone was renting the home and indicated that there was only a verbal agreement for them to rent the premises. Tr. 30.

{¶11} On cross-examination Hammons testified that he was allowed to access the closet whenever he wished, but that he always knocked on the door before he entered. Tr. 31. The closet in question was inside the room used as a living room by Wooten. Tr. 32. Hammons indicated that there was a door at the top of the stairs. Tr. 33. During the time that the upstairs was rented, Hammons had to access the closet one time and he did not ask permission prior to doing so. Tr. 34.

{¶12} Wooten presented the testimony of two witnesses at the hearing. Brook Owens ("Owens") testified that she had previously visited Wooten at the home. Tr. 37. Owens indicated that the door at the top of the stairs had a lock on it and that Wooten had to unlock it when she came to visit. Tr. 38. On cross-examination Owens admitted that there were times the door was left open. Tr. 40. Owens also admitted that she did not know if Hammons stored items upstairs. Tr. 44.

{¶13} Wooten testified that she was renting space from Hammons. Tr. 45. According to Wooten, the layout of the house was as follows.

**A      When you first walked into the front door you walked into the living room and then maybe five foot maybe [sic] you would walk through the living room to the set of steps and there was a little slight, like right turn that you had to turn.**

**Q      There was a landing?**

**A      Yeah, there was a landing there and you kind of had to turn to the right to actually see the front door of what I would consider to be my apartment.  And then when you go into, through that door you go into, we had it set up as a living room, and then we had a second room that we had set up as our bedroom.**

**\* \* \***

**Q      What was the locking arrangement?**

**A      It was just like [Owens] had described. It was kind of like a padlock that had – we had the latch on each side like the outside of the door and the inside of the door and there was a latch that you could, if we were there of course and we wanted to be inside our apartment we locked it from the inside, and then if we were leaving to go somewhere we would lock it from the outside.**

**Q      Now, was it your understanding that [Hammons] had then rented you that space on the second floor?**

**A      Yes, sir.**

Tr. 45-46.

**{¶14}** Wooten testified that Hammons had nothing in the closets and generally did not come up the stairs unless they asked him to do so.[1] Tr. 47.  Wooten admitted that at the time the police came in the house, the door at the top of the stairs

---

[1] Although the testimony was that Hammons generally did not come up the stairs unless he was asked to do so, this does not mean that he did not have the right to be on the stairs.  The stairs had no obstruction and were part of the common area of the home shared by both the owner and the tenants who were renting two rooms at the top of the stairs.

was fully open and that from the doorway, Wheeler was able to see her in the bedroom as that door was open as well. Tr. 50. Wooten testified that after Wheeler saw her with the crack pipe, she offered to cooperate. Tr. 51.

{¶15} After the testimony, the trial court made its decision. The trial court determined that Hammons had given the police consent to search the house and indicated that he owned the home. Tr. 70-71. Hammons had not told the police that anyone was renting the upstairs of the home. Tr. 71. Hammons also had testified that he had items stored in the upstairs and he had unrestricted access to the closet. Tr. 71. These findings of fact are supported by the testimony at the hearing. Viewing the evidence in this case, there was competent, credible evidence presented that Hammons had actual authority to permit the officers to enter the home.[2] The record does not indicate that there was any obstacle at the bottom of the stairs that would provide any indication that the stairs were anything but a common area of the home.[3] As a common area, Hammons, as the owner of the premises had actual authority to allow the police to climb the steps and go up to the landing.

{¶16} Once Wheeler was at the top of the stairs, the door was wide open. At that time Wheeler saw Wooten through the open door attempting to conceal

---

[2] Contrary to the assertion of the dissent, we are not stating that the search was permissible based upon a good faith exception to the warrant requirement. The evidence supports the trial court's determination that Hammons, as the homeowner in residence, had actual authority to invite the officers into the home and into any common area of the home.

[3] If there had been a door at the bottom of the steps with a lock, then we would concur with the dissent. However, the door with the lock was on the room upstairs and Wooten had no expectation of privacy before that door as the area before the door with the lock was open to anyone in the home.

something in her pants. Wooten admitted that Wheeler would have seen her with her hands in the front of her pants. Not knowing what Wooten was doing, he testified that he was concerned for officer safety and wanted to conduct a pat down search of Wooten to insure that she was not concealing a weapon. See *State v. Andrews,* 57 Ohio St.3d 86, 565 N.E.2d 1271 (1991) (officer may conduct a protective pat down search if he has a reasonable concern about his safety during an investigation). Wheeler also testified that when he ordered Wooten to turn around and face him so that he could see what she was doing with her hands, Wooten removed the crack pipe and put it in plain view of Wheeler.[4] Wooten then voluntarily told Wheeler where the drugs were.

{¶17} Since the evidence of the offense was in the plain view of the officer, the warrantless entry into the upstairs of the home was valid. The results of the subsequent search were all based upon exceptions to the warrant requirement of the U.S. Constitution and did not need to be suppressed. Therefore, the assignment of error is overruled.

{¶18} Having found no error in the particulars assigned and argued, the judgment of the Court of Common Pleas of Marion County is affirmed.

*Judgment Affirmed*

**PRESTON, J., concurs.**

---

[4] The testimony differed as to whether there was one or two crack pipes.

**ROGERS, J., dissents.**

{¶19} I must respectfully dissent from the opinion of the majority.

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused.

*United States v. Leon*, 468 U.S. 897, 919, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), citing *United States, v. Peltier*, 422 U.S. 531, 539, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975).

{¶20} The conduct of law enforcement in this case was at best grossly negligent, if not willful.

{¶21} A review of the testimony quickly reveals that the upstairs of Hammon's house was rented to the Appellant and another, and that there was no common area that was utilized by Hammon. Although Hammon testified that there was an agreement that he could use an upstairs closet, that gives him no actual authority to enter the rented portion of the house at will and without advance notice, nor any actual authority to consent to a search of the rented premises. He indicated that he had once entered the apartment to obtain access to the closet, and had done so without asking permission. That did not render his doing so proper or legal.

{¶22} Although there was no door at the bottom of the steps, there was a landing, and the steps themselves constituted a natural obstruction to random access.

{¶23} "Generally, a common area is an area over which multiple people have possession and control." *Engwert-Loyd v. Ramirez*, 6th Dist. Lucas No. L-06-1084, 2006-Ohio-5468, ¶ 11, citing *Burrell v. Iwenofu*, 8th Dist. Cuyahoga No. 81230, 2003-Ohio-1158, ¶ 15. There was no shared purpose or use of the stairs by Hammon in this case.

{¶24} But the major flaw of the majority's rationale is the total absence of common sense, and the gross negligence, on the part of the law enforcement officers in initiating entrance to the rented premises.

{¶25} While Hammons had contacted the Sheriff's Department with a complaint about illegal activity in his residence, it is beyond belief that any law enforcement officer would proceed to "raid" the house without first asking "who are these people, and why are they in your house?"

{¶26} The response would necessarily be that they are renting the upstairs, and any competent law enforcement officer would then have obtained a warrant before proceeding with a "raid."

{¶27} If the majority would then argue apparent authority, that argument should fail as well.

> A search consented to by a third party without actual authority over the premises is valid only if the officer could reasonably conclude from the facts available that the third party had authority to consent to the search. Whether apparent authority existed must "be judged against an objective standard: would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises." *Illinois v.*

> *Rodriguez*, 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), quoting *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

(Citation Omitted.) *State v. Norman*, 12th Dist. Warren No. CA2014-02-033, 2014-Ohio-5084, ¶ 38 (trial court's denial of motion to suppress reversed on appeal).

{¶28} The key here is whether the facts available to the officer would warrant a man of reasonable caution to believe that the consenting party had authority over the premises. The *facts available* are not limited to what the police are told, but necessarily include those facts which could have been, and should have been, elicited by proper inquiry. In my opinion, a reasonable man would not have entered the residence at all without first inquiring as to the circumstances, most important of which again are: 1) who are the parties of which Hammon is complaining, and 2) what rights do those individuals have in the premises.

{¶29} If these questions are asked, the response is that they are tenants and have an expectation of privacy in the areas which they rent. At that point, a reasonable man would not enter the upstairs of the residence without first obtaining a warrant to search. These facts were readily available to the law enforcement officers and there can be no logical reason why these questions were not asked.

{¶30} Finally, although it has not been argued by the majority, what appears to be the actual basis of their position is "good faith." However, courts continue to apply the good faith exception almost exclusively in the context of a search pursuant

to a search or arrest warrant that is later found to be defective. *See generally State v. Simon*, 119 Ohio App 3d 484 (9th Dist.1997).

**{¶31}** Accordingly, I dissent.


**/hls**